

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00095-CR

**JEREMY CHAD BUKOWSKI,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 18th District Court
### Johnson County, Texas
### Trial Court No. F45969

## MEMORANDUM  OPINION

In four issues, appellant, Jeremy Chad Bukowski, challenges his conviction for capital murder.  *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2013).  Specifically, appellant contends that:  (1) police did not have reasonable suspicion to stop him; (2) the trial court erred by failing to include an instruction in the jury charge requiring unanimity with respect to the alleged felonies underlying the capital-murder offense;

(3) his confession violated the "Texas Confession Statute"; and (4) the trial court erroneously admitted hearsay evidence during a suppression hearing. We affirm.[1]

## I.   APPELLANT'S MOTION TO SUPPRESS

In his first issue, appellant contends that he was arrested pursuant to an illegal stop. Specifically, appellant argues that law enforcement did not have reasonable suspicion to pull him over. As such, appellant asserts that the trial court abused its discretion in denying his first amended motion to suppress.

### A.   Standard of Review

We review the trial court's ruling on a motion to suppress evidence for an abuse of discretion, using a bifurcated standard. *See Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). We give "almost total deference" to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We review de novo the trial court's determination of the law and its application of law to facts that do not turn upon an evaluation of credibility and demeanor. *Id.* When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, so long as it finds some support in the record. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006); *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). We will uphold the trial court's ruling if it is reasonably supported by the record and is

---

[1] As this is a memorandum opinion and the parties are familiar with the facts, we only recite those facts necessary to the disposition of the case. *See* TEX. R. APP. P. 47.1, 47.4.

correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

When ruling on a motion to suppress, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). When reviewing a trial court's ruling on a motion to suppress, we view all of the evidence in the light most favorable to the ruling. *Garcia-Cantu v. State*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

When a trial judge makes explicit fact findings regarding a motion to suppress, an "appellate court [must first] determine whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *Kelly*, 204 S.W.3d at 818. "The appellate court then reviews the trial court's legal ruling[s] de novo unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling." *Id.*

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures by government officials. U.S. CONST. amend. IV; *see Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007); *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App. 2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made

this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672-73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

Whether a search is reasonable is a question of law that we review de novo. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). Reasonableness is measured by examining the totality of the circumstances. *Id.* at 63. It requires a balancing of the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Id.* A search conducted without a warrant is per se unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).

## B. Reasonable Suspicion

The Texas Court of Criminal Appeals has recognized three distinct categories of interactions between police officers and citizens: (1) encounters; (2) investigative detentions; and (3) arrests. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002). Courts look to the totality of the circumstances to determine into which category an interaction falls. *Crain*, 315 S.W.3d at 49.

An investigatory detention occurs when a person yields to an officer's show of authority under a reasonable belief he is not free to leave. *Id.* The inquiry is whether a reasonable person in the citizen's position would have felt free to decline the officer's requests or otherwise terminate the encounter. *Id.* "[A] police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the

officer lacks probable cause." *Woods v. State*, 956 S.W.2d 33, 35 (Tex. Crim. App. 1997) (quoting *Terry v. Ohio*, 392 U.S. 1, 29, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889 (1968)). This is an objective standard that disregards any subjective intent of the detaining officer and looks solely to whether an objective basis for the detention exists. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). When an officer subjects a defendant to an investigatory detention, it is the State's burden to prove the reasonableness of the warrantless detention. *Id.*

Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude a particular person actually is, has been, or soon will be engaged in criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007). Whether reasonable suspicion exists depends on the content of the information known to the officer as well as its degree of reliability. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). The State need not, however, establish that a crime actually occurred prior to the investigatory detention, and a detention or search is unlawful at its inception may not be validated by what it turns up. *State v. Griffey*, 241 S.W.3d 700, 704 (Tex. App.—Austin 2007, pet. ref'd); *see Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 1379, 146 L. Ed. 2d 254 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). The reasonableness of a temporary detention is examined in terms of the "totality of the circumstances" at its inception. *See Woods*, 956 S.W.2d at 38. Individual circumstances must not be considered in isolation, and the facts known to the officer must amount to

something more than an inchoate and unparticularized suspicion or hunch. *Id.* at 35. Moreover, the *Woods* Court recognized that "there may be instances when a person's conduct viewed in a vacuum, appears purely innocent, yet when viewed in light of the totality of the circumstances, those actions give rise to reasonable suspicion." *Id.* at 38.

There is no requirement that the "facts adduced to give rise to a reasonable suspicion must show that the detainee has committed, is committing, or is about the commit, a particular and distinctively identifiable penal offense." *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011). The *Derichsweiler* Court explained that:

> Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.
>
> . . . .
>
> Unlike the case with probable cause to justify an arrest, it is not a *sine qua non* of reasonable suspicion that a detaining officer be able to pinpoint a particular penal infraction. The reason is simple but fundamental. A brief investigative detention constitutes a significantly lesser intrusion upon the privacy and integrity of the person than a full-blown custodial arrest. For this reason, a warrantless investigative detention may be deemed "reasonable for Fourth Amendment purposes on the basis of a lesser quantum or quality of information—reasonable suspicion rather than probable cause. Likewise, because a detention is less intrusive than an arrest, the specificity with which the articulable information known to the police must demonstrate a particular penal offense has occurred, is occurring, or soon will occur, is concomitantly less. It is, after all, only an "investigative" detention. So long as the intrusion does not exceed the legitimate scope of such a detention and evolve into a greater intrusiveness inherent in an arrest-*sans*-probable-cause, the Fourth Amendment will tolerate a certain degree of police proaction.

*Id.* at 915-17 (internal footnotes & quotations omitted) (emphasis in original); *see Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1987) (op. on reh'g) (noting that probable cause is to be evaluated by the court on the basis of the collective information of the police rather than that of only the officer who conducts the search or performs the act of arresting).

**C.    Discussion**

In its findings of fact and conclusions of law, the trial court found the following beyond a reasonable doubt:

(1) Deputy Michael Pool[e] personally observed the scene of the Capital Murder, Robbery[,] and Burglary at the home of the alleged victim, Rick Warren[,] in Rio Vista, Johnson County, Texas. Deputy Pool[e] conducted interviews of Michelle Adams, the victim's sister, and Eddie Reed, the victim's brother-in-law at the scene of the offenses. Deputy Pool[e] was told by Michelle Adams that the defendant, Jeremy Bukowski[,] and his girlfriend, Jennifer Davis, had recently lived with the victim and had been evicted from the property by the victim's mother because they had stolen items from the victim. Michelle Adams related to Deputy Pool[e] that the defendant was angry about his eviction and the allegations of theft and that she believed that he was the one who had committed the offenses against the victim. Deputy Pool[e] relayed this information to other deputies and detectives with the Johnson County Sheriff's Office, including Leona Yocham, Deputy Clark, Sheriff Bob Alford, and Troy Fuller.

(2) Troy Fuller responded to the crime scene in Rio Vista and was given reports by all deputies and other personnel on the scene, including deputies Poole and Clark and detectives Mike Gaudet and Leona Yocham and others. Based on the information he received, including information derived from Michelle Adams and the law enforcement on the scene, he believed that the defendant, Jeremy Bukowski[,] was the actor in the offenses, a suspect in the offenses or had been involved in the offenses and other criminal activity. Based on these beliefs, Troy Fuller contacted the Johnson County Sheriff's Dispatch and requested a call to be released to law enforcement to find the defendant, Jeremy Bukowski, and to stop him and investigate him for his involvement in the Capital Murder, Robbery[,]

and Burglary of Rick Warren. Troy Fuller spoke directly to Lee Shastid and Marshall Whitlock of the Johnson County Sheriff's Office and asked them to find, detain[,] and investigate the defendant. Shastid and Whitlock received information from Troy Fuller and began to look for the defendant in Burleson, Texas, one of Bukowski's last known residences. Troy Fuller had been provided with the name, date of birth, description, vehicle description[,] and a photo of the defendant, Jeremy Bukowski, which was provided to Shastid, Whitlock[,] and other members of law enforcement who were asked to find, detain[,] and investigate the defendant.

(3) Marshall Whitlock of the Johnson County Sheriff's Office was also assigned to the STOP Special Crimes Unit of Johnson County. Whitlock contacted other members of STOP, including Mark Goetz, Larry Sparks[,] and Nick Garret[t], and asked them to detain and investigate the defendant for Capital Murder. Larry Sparks was provided with the name, date of birth, vehicle description[,] and photograph of the defendant and began looking for him in Cleburne, Johnson County, Texas. Sparks was able to find Bukowski using the photograph provided and seeing him in a vehicle that matched the description of Bukowski's vehicle at a known drug location in Cleburne, Texas at 510 E. Willingham Street. Sparks began following the vehicle and called to Mark Goetz and Nick Garrett to stop the vehicle for investigation of Bukowski's involvement in the Capital Murder.

(4) Mark Goetz pulled along Bukowski's vehicle and signaled him to pull over, which he did. Sparks then made contact with Bukowski and asked him to exit the vehicle and conducted a "Terry frisk" for officer safety. Sparks asked Bukowski if he had anything in his pockets that would hurt Sparks. Bukowski said he had "a point (syringe) in his right pocket that he had used to shoot methamphetamine that morning." Sparks asked Bukowski if he had anything illegal in the vehicle and Bukowski admitted to having scales in the vehicle. Sparks arrested Bukowski for the criminal offense of Possession of Drug Paraphernalia. Sparks conducted an inventory of the vehicle and had Officer Nick Garrett transport the vehicle for impound at the Johnson County Sheriff's Office.

(5) That under the totality of the circumstances, the stop and detention of Defendant was lawfully conducted based on reasonable suspicion that an offense had been committed or was being committed and that Defendant was involved. The warrantless pat down search of Defendant was lawfully conducted for officer safety. The arrest of Defendant and the search incident to that arrest of the vehicle were lawfully conducted after

the arrest of Defendant of the criminal offense of Possession of Drug Paraphernalia.

On appeal, appellant complains that Adams did not personally witness the alleged crimes; therefore, she was not a reliable witness upon which police could rely to develop reasonable suspicion. We disagree.

The Texas Court of Criminal Appeals has stated that "information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable." *Derichsweiler*, 348 S.W.3d at 914-15. Further, "[i]n such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Id.* at 915.

Testimony during the suppression hearing demonstrated that Adams was on the property the night of the incident and that she made a frantic telephone call to the police at approximately 2:00 a.m., relaying that: "someone had broken into her brother's house, had taken his items, and had hurt him. Those were her words. And that he was not breathing."

Upon arriving at the scene, police saw Adams, a resident on the property who lived about twenty yards away from the crime scene, standing in the driveway "visibly frantic, arms waving, very distraught." The police subsequently investigated Warren's mobile home and discovered visible damage to the inside door frame, that several of Warren's possessions were missing, and Warren "laying [sic] on the floor by his bed

laying [sic] on his back face up. He was very, very visible in the face and there was [sic] no visible signs of life." Based on their investigation of the crime scene, police determined that Warren had been murdered and that a robbery or burglary had taken place.

After securing the scene, police spoke with Adams once again. According to Michael Poole, a patrol deputy for the Johnson County Sheriff's Office, Adams recounted the following:

> Ms. Adams advised us that approximately 1:00 o'clock she had been visiting with her brother. They'd been sitting out on the front porch just kind of talking. She returned to her residence. [Warren] went inside his. And then maybe an hour later she noticed that his front door was open, which she advised us was not common behavior for him, and she heard a loud thud or banging sound as she went to try to make contact with her brother and she saw two shadows. That was all that she was able to describe it as. And then she went inside after she awoke [sic] her husband up. They went in and found Mr. Warren and called us.

When asked who might have been involved in the incident, Adams advised police that: (1) appellant and his girlfriend, Jennifer Davis, had recently lived in Warren's mobile home, which is located in a remote place; (2) equipment used for the renovation of other mobile homes on the property was missing during the time appellant and Davis lived in Warren's mobile home; (3) she confronted appellant about the missing items and asked Davis to leave; (4) appellant and Davis refused to leave and continued living in Warren's mobile home until Adams's mother arrived from out of state and had appellant and Davis evicted; and (5) appellant was angry about the eviction. In fact, Adams told Deputy Poole that the eviction of appellant and his girlfriend was an "unpleasant experience, it was not a happy parting." In addition,

Adams noted that appellant is a member of the Aryan Brotherhood criminal gang and that his street name is "Bounce." Several officers testified at the suppression hearing that they regarded Adams as credible and reliable.

Based on the information obtained from the crime scene and from Adams, police determined that appellant had a motive to commit the crimes and, thus, was a person of interest. Police proceeded to obtain information about appellant's vehicle and his whereabouts. Appellant was well known to police as a drug user in the area; therefore, police were able to obtain appellant's name, date of birth, description, vehicle description, and a photo of appellant. Appellant was eventually discovered in Cleburne, Texas, and Officer Mark Goetz effectuated the stop and detention of appellant, as noted in the trial court's findings of fact and conclusions of law.

Considering the knowledge of all of the police involved in the investigation, in addition to the totality of the circumstances, we conclude that the record contains sufficient, articulable facts that give rise to reasonable suspicion that criminal activity was afoot and, thus, supports the temporary detention of appellant. *See State v. Kerwick*, 393 S.W.3d 270, 273-74 (Tex. Crim. App. 2013) (citing *Martinez*, 348 S.W.3d at 923; York v. State, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011)); *see also Derichsweiler*, 348 S.W.3d 915-17; *Castro*, 227 S.W.3d at 741. As such, we cannot say that the trial court abused its discretion in denying appellant's motion to suppress. *See Crain*, 315 S.W.3d at 48; *see also Guzman*, 955 S.W.2d at 88-89. Accordingly, we overrule appellant's first issue.

## II.    THE JURY CHARGE

In his second issue, appellant complains that the jury charge wrongfully allowed a non-unanimous verdict because it did not require the jury to agree on the underlying offense—robbery or burglary—during which the murder occurred.

### A.    Standard of Review

In reviewing a jury-charge issue, an appellate court's first duty is to determine whether error exists in the jury charge. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996). If error if found, the appellate court must analyze that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453-54 (Tex. Crim. App. 2003). If an error was properly preserved by objection, reversal will be necessary if the error is not harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Conversely, if error was not preserved at trial by a proper objection, a reversal will be granted only if the error presents egregious harm, meaning appellant did not receive a fair and impartial trial. *Id.* To obtain reversal for jury-charge error, appellant must have suffered actual harm and not just merely theoretical harm. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). To determine whether a defendant suffered harm, we consider: "(1) the charge itself; (2) the state of the evidence[,] including contested issues and the weight of the probative evidence; (2) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole." *Jordan v. State*, 1 S.W.3d 153, 157 (Tex. App.—Waco 1999, pet. ref'd) (quoting *Hutch*, 922 S.W.2d at 171).

### B.    Jury Unanimity

The Texas Constitution requires a unanimous verdict in felony criminal cases. TEX. CONST. art. V, § 13; *see* TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (West Supp. 2013). A unanimous verdict is more than a mere agreement on a violation of a statute; it ensures that the jury agrees on the factual elements underlying an offense. *Francis v. State*, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000) (op. on reh'g) (en banc). Generally, instructing a jury on alternative theories of committing the same offense does not violate the unanimity requirement. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004); *see Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006) ("Thus, while jury unanimity is required on the essential elements of the offense, when the statute in question establishes different modes or means by which the offense may be committed, unanimity is generally not required on the alternate modes or means of commission." (internal citations and quotations omitted)). If a defendant is charged with multiple offenses, however, the trial court must instruct the jury that it cannot return a guilty verdict unless it unanimously agrees upon which offense the defendant committed. *Soto v. State*, 267 S.W.3d 327, 335 (Tex. App.—Corpus Christi 2008, no pet.) (citing *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc)).

## C.    Discussion

At trial, appellant objected to sections six and seven of the jury charge on the grounds that neither required unanimity as to which underlying offense of capital murder was committed—robbery or burglary. In *Gardner v. State*, the Texas Court of Criminal Appeals stated the following:

We have consistently followed the *Kitchens* analysis in the context of capital murder jury charges: the gravamen of capital murder is intentionally (or knowingly) causing a death, plus any one of various different types of aggravating elements, and we most recently concluded that our holding in *Kitchens* applies equally to all alternate theories of capital murder contained within [Penal Code] § 19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder. *Kitchens* remains good law. The jury charge properly set out the underlying felonies of burglary and retaliation in the disjunctive, and the jury did not need to be unanimous concerning which felony appellant was in the course of committing.

306 S.W.3d 274, 302 (Tex. Crim. App. 2009) (internal citations and quotations omitted);

*see Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). In *Kitchens*, the Court

noted that:

And although the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive. It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. Indeed, the Supreme Court has determined that there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

823 S.W.2d at 258 (internal citations and quotations omitted); *see Russeau v. State*, 171

S.W.3d 871, 877 (Tex. Crim. App. 2005) ("[T]he evidence in a capital murder prosecution

need be sufficient to establish only one of the underlying felonies alleged in the

indictment.").

Here, appellant was charged with capital murder under section 19.03(a)(2),

which provides that a person "commits an offense if the person commits

murder . . . and . . . the person intentionally commits the murder in the course of

committing or attempting to commit . . . burglary, robbery . . . ." TEX. PENAL CODE ANN.

§ 19.03(a)(2). Moreover, in this case, the indictment alleged both burglary of a habitation and robbery in the conjunctive as underlying felonies for capital murder. In addition, the jury charge alleged the same victim for the predicate murder, Warren, and allowed the jury to convict appellant of capital murder if they found beyond a reasonable doubt that he caused the death of Warren while in the course of committing or attempting to commit robbery *or* burglary of a habitation. In other words, the jury was charged in the disjunctive with respect to the purported burglary of a habitation and robbery felonies underlying the capital-murder offense. Under the law articulated in *Gardner* and *Kitchens*, this is proper. *See Gardner*, 306 S.W.3d at 302; *see also Kitchens*, 823 S.W.2d at 258. The jury was not required to be unanimous on which of the two underlying felonies appellant was in the course of committing or attempting to commit when he caused the death of Warren.[2] *See Gardner*, 306 S.W.3d at 302; *see also Kitchens*, 823 S.W.2d at 258. As such, we cannot say that the jury charge was erroneous. *See Gardner*, 306 S.W.3d at 302; *Kitchens*, 823 S.W.2d at 258; *see also Hutch*, 922 S.W.2d at 170. We therefore overrule appellant's second issue.

---

[2] In any event, in his brief, appellant relies heavily on the Texas Court of Criminal Appeals' decision in *Ngo v. State* to support his contention that the charge in this case was erroneous because it did not require unanimity with regard to the underlying felonies alleged. *See* 175 S.W.3d 738, 745, 755 (Tex. Crim. App. 2005) (en banc). This case is distinguishable from *Ngo*. In *Ngo*, the State sought one conviction for credit-card abuse with evidence that at different times the defendant committed three different acts that the applicable statute defined as separate criminal offenses and not as means of committing a single criminal offense. *See Ngo*, 175 S.W.3d 738, 743. However, in this case, the State sought one conviction for capital murder, alleging two different acts—burglary of a habitation and robbery—that section 19.03 of the Texas Penal Code defines as means for committing a single criminal offense and not as two separate criminal offenses. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2013).

### III. APPELLANT'S STATEMENT TO POLICE

In his third issue, appellant asserts that the trial court abused its discretion by failing to suppress his September 21, 2011 written statement, wherein appellant confessed to being present and taking part in the incident. Specifically, appellant argues that his written statement was not voluntary and should have been suppressed.

## A. Applicable Law

It is the State's burden to establish a valid waiver of *Miranda* rights by a preponderance of the evidence. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011) (citing *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010)). "There are two facets to any inquiry with respect to the adequacy of a purported waiver of *Miranda* rights . . . ." *Id.*

> First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001) (quoting *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987) (footnotes omitted)). "Before it may be said that a waiver of a *Miranda* right is involuntary, however, there must be some element of official intimidation, coercion, or deception." *Leza*, 351 S.W.3d at 349 (citing *Colorado v. Connelly*, 479 U.S. 157, 169-70, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473 (1986); *Oursbourn v. State*, 259 S.W.3d 159, 170 (Tex. Crim. App. 2008)). Moreover, regarding the requirement that the waiver must also be knowing and intelligent, the United States Supreme Court has noted:

> Once it is determined that a suspect[ ] . . . at all times knew he could stand mute . . ., and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Moran v. Burbine*, 475 U.S. 412, 422-23, 106 S. Ct. 1135, 1141, 89 L .Ed. 2d 410 (1986).  A waiver is knowingly and intelligently made if the accused has been made aware and fully comprehends that he has the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law.  *Leza*, 351 S.W.3d at 350.

Article 38.22 of the Texas Code of Criminal Procedure provides that, when a written statement is obtained as a result of custodial interrogation, the statement must show on its face that:  (1) the accused received the required warning; and (2) prior to and during the making of the statement, the accused knowingly, intelligently, and voluntarily waived his rights.  TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)-(b) (West Supp. 2013).  If these requirements are not met, then the statement is inadmissible.  *See id.*

"Article 38.22 requires merely that the accused receive the statutory warnings before giving a statement."  *Brooks v. State*, 991 S.W.2d 39, 41 (Tex. App.—Fort Worth 1998, pet. ref'd) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)).  "'Because a written statement is not obtained (because it is not admissible) until it is signed, giving the required warnings before the accused signs the statement meets the statutory requirements.'"  *Id.* (quoting *Dowthitt v. State*, 931 S.W.2d 244, 258 (Tex. Crim. App.

1996)).  In *Garcia v. State*, the Texas Court of Criminal Appeals stated that an accused receives the warnings where they are located at the top of the page above his statement. 919 S.W.2d 370, 386 (Tex. Crim. App. 1996) (op. on reh'g); *see Brooks*, 991 S.W.2d at 41. "[T]he appearance of [appellant's] initials . . . is evidence that he received them." *Garcia*, 919 S.W.2d at 386.  Moreover, "the presence of a valid waiver of the rights contained in section 2(a) can be ascertained from considering the totality of an accused's statement, and the waiver (required by section 2(b)) is sufficient if it substantially complies with section 2(b)." *Gutierrez v. State*, 945 S.W.2d 287, 289 (Tex. App.—San Antonio 1997, no pet.) (citing *Garcia*, 919 S.W.2d at 387).  A waiver can be inferred from the language contained in the written statement itself.  *See, e.g., Smith v. State*, AP-75,793, 2010 Tex. Crim. App. Unpub. LEXIS 582, at *13 (Tex. Crim. App. Sept. 29, 2010) (per curiam) (citing *Garcia*, 919 S.W.2d at 385-86).

### B.      Discussion

In this issue, appellant specifically complains about State's exhibit 1, which is the written, voluntary statement appellant gave to Johnson County Sheriff's Office Detective Leona Yocham.  Specifically, appellant contends that the statement was not voluntary because Detective Yocham only included appellant's identifying information on the first page of the seven-page document.  Appellant argues that this oversight and the fact that the video of appellant's interrogation by police is missing suggests that his statement was neither voluntary nor knowing.  We disagree.

A review of the seven-page statement shows that appellant provided information about the incident to Yocham, who documented appellant's statements on a form

generated by the Johnson County Sheriff's Office. At the top of the first page of the document, Yocham included the date and time of the statement and appellant's identifying information. Yocham did not include this information on the other six pages contained in the statement.

Nevertheless, on each page of the seven-page statement, the following warnings were provided:

> FIRST[:] THAT I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL AND THAT ANY STATEMENT I MAKE MAY BE USED AGAINST ME AT MY TRIAL[.]
>
> SECOND[:] THAT ANY STATEMENT I MAKE MAY BE USED AS EVIDENCE AGAINST ME AT COURT.
>
> THIRD[:] THAT I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING[.]
>
> FOURTH[:] THAT IF I AM UNABLE TO EMPLOY A LAWYER, I HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING[.]
>
> FIFTH[:] THAT I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME[.]
>
> PRIOR TO AND DURING THE MAKING OF THIS STATEMENT, I HAVE AND DO KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE THE ABOVE EXPLAINED RIGHTS AND I DO MAKE THE FOLLOWING VOLUNTARY STATEMENT TO THE AFOREMENTIONED PERSON OF MY OWN FREE WILL AND WITHOUT ANY PROMISES OR OFFERS OF LENIENCY OR FAVORS, AND WITHOUT COMPULSION OR PERSUASION BY ANY PERSON OR PERSONS WHOMSOEVER . . . .

(Emphasis in original). On all of the seven pages of the statement, appellant initialed the above-mentioned warnings, indicating that he waived his *Miranda* rights and that

his statement was voluntary. Furthermore, each page of the statement also included the following language after which appellant signed as "SIGNATURE OF PERSON MAKING VOLUNTARY STATEMENT": "I HAVE READ THIS STATEMENT CONSISTING OF 7 PAGE(S), EACH PAGE OF WHICH BEARS MY SIGNATURE AND I DO AFFIRM THAT ALL FACTS AND STATEMENTS CONTAINED HERIN ARE TRUE AND CORRECT." (Emphasis in original). This language indicates that the written statement appellant gave to police comprised seven pages, and appellant's identity on each of the pages is clear from the context of the document. Additionally, appellant's signature at the bottom of each page as the "SIGNATURE OF PERSON MAKING VOLUNTARY STATEMENT" combined with his initials regarding the *Miranda* warnings at the top of each page sufficiently conveys by a preponderance of the evidence that appellant understood his constitutional rights and that he knowingly, intelligently, and voluntarily waived those rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)-(b); *see also Leza*, 351 S.W.3d at 349-50. Moreover, appellant does not direct us to evidence in the record demonstrating official intimidation, coercion, or deception. *See Leza*, 351 S.W.3d at 349; *see also Oursbourn*, 259 S.W.3d at 170.

Accordingly, a review of the totality of appellant's written statement demonstrates that the requirements of article 38.22, section 2(b) were met. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b); *Garcia*, 919 S.W.2d at 386-87; *Gutierrez*, 945 S.W.2d at 289; *see also Smith*, 2010 Tex. Crim. App. Unpub. LEXIS 582, at *13. As such, we cannot say that the trial court abused its discretion by denying appellant's motion to

suppress State's exhibit 1. *See Crain*, 315 S.W.3d at 48; *see also Guzman*, 955 S.W.2d at 88-89. We overrule appellant's third issue.

## IV. HEARSAY

In his fourth issue, appellant asserts that the trial court abused its discretion in overruling his hearsay objection to testimony provided by Texas Ranger Michael Don Stoner. In particular, appellant argues Ranger Stoner's testimony that Adams told him that appellant may have wanted to hurt her brother should have been excluded on hearsay grounds.

### A. Standard of Review

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). "Under an abuse of discretion standard, an appellate court should not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

### B. Applicable Law

With the exception of privileges, the Texas Rules of Evidence do not apply to suppression hearings because they involve only the determination of preliminary questions. *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Granados v. State*, 85 S.W.3d 217, 227 (Tex. Crim. App. 2002)). In *Granados*, appellant complained that, at the suppression hearing, the trial court erred in admitting into evidence a police officer's testimony of what another officer told him about what

the victim's family said about the victim's whereabouts. *Id.* at 226-27. Appellant claimed that testimony constituted inadmissible hearsay. *Id.* at 227. The *Granados* Court concluded that the officer's testimony where "he testified as to the facts that he . . . believed constituted probable cause," was not hearsay and, thus, admissible. *Id.* at 230. Moreover, the *Granados* Court noted that the testimony would have been admissible, even if it had been hearsay, because courts are permitted to rely on hearsay and other inadmissible evidence in suppression hearings even though it would not otherwise be admissible at trial. *Id.* at 227 n.29 (citing *United States v. Raddatz*, 447 U.S. 667, 679, 100 S. Ct. 2406, 2414, 65 L. Ed. 2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.")).

Here, appellant complains about Ranger Stoner's testimony during a suppression hearing. Even if Ranger Stoner's testimony constituted hearsay, because the Texas Rules of Evidence do not apply to suppression hearings, we cannot say that the trial court abused its discretion in admitting the testimony.[3] *See Raddatz*, 447 U.S. at 679, 100 S. Ct. at 2414; *Granados*, 85 S.W.3d at 227; *Graves*, 307 S.W.3d at 489; *see also De La Paz*, 279 S.W.3d at 343; *McDonald*, 179 S.W.3d at 576. As such, we overrule appellant's fourth issue.

## V. CONCLUSION

---

[3] We also question whether the complained-of testimony is really hearsay given that the content of Ranger Stoner's testimony about what Adams told him described how appellant became a suspect in this case. *See Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.) ("Police officers may testify to explain how the investigation began and how the defendant became a suspect."); *see also Zamora v. State*, No. 13-10-00146-CR, 2010 Tex. App. LEXIS 10246, at *22 (Tex. App.—Corpus Christi Dec. 30, 2010, no pet.) (mem. op., not designated for publication) (same).

Having overruled all of appellant's issues on appeal, we affirm the judgment of the trial court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed January 9, 2014
Do not publish
[CRPM]